### In re Grievance of Royal Bushey

[455 A.2d 818]

No. 471-81

Present: Barney, C.J., Billings, Hill and Underwood, JJ., and Larrow, J. (Ret.), Specially Assigned

Opinion Filed December 1, 1982

Motion for Reargument Denied January 3, 1983

*Michael R. Zimmerman,* Montpelier, for Plaintiff-Appellee.

*John J. Easton, Jr.,* Attorney General, and *J. Scott Cameron,* Assistant Attorney General, Montpelier, for Defendant-Appellant.

**Barney, C.J.** The Labor Relations Board found that grievant's separation from state service in the Department of Corrections amounted to an unjustified dismissal. To reach that result the Board ruled that the grievant's act of resignation by letter was improperly induced and, in effect, involuntary. The Board found that there were deliberate acts by senior Department officials putting pressures on the grievant intended to produce that act of resignation. Determining that the facts of this case do not support the concept of involuntary resignation, we reverse.

It should be kept in mind that only by converting the resignation into a discharge can this controversy come before the Labor Relations Board. Further, only by then proving, in addition, that this conceptual discharge is wrongful, that is to say, "without just cause," can the Board require remedial action. Moreover, only those grievances resting on a claim of wrongful discharge may dispense with the usual four step procedure required to bring the matter before the Board. None of the matters set forth by the grievant as conduct wrongfully designed to induce his discharge were even pursued beyond the first, informal step so as to give jurisdictional support to review by the Board of any of these matters. The result is that review here is confined to the issue of whether, taking everything into account, this is a case of a discharge without just cause or a resignation.

Since a discharge is the essential underlying ingredient for this proceeding, and since it is unquestioned that the employment was terminated by resignation, the case record is largely concerned with the issue of "constructive discharge." This is the shorthand expression that refers to a discharge that was improperly procured or induced to the point that, conceptually, the resigned employee should be taken to have been discharged, and his rights evaluated accordingly.

The law is certainly no stranger to the notion that an action, binding if voluntary, is released from its conclusiveness

if, in the eyes of the law, it is not validly voluntary. Examples abound involving instruments such as confessions, contracts, releases, deeds, mortgages, and receipts. The notion that certain documents, such as those under seal, will be conclusive in their operation no matter whether their execution was obtained by fraud or force has long since been rejected, first in equity and now in law.

That is the philosophical source of the position advanced here by this grievant. In essence, he is claiming that there were improper actions by his employer so threatening and coercive that his resignation should be viewed as compelled rather than as his voluntary act, thus justifying review and remedy under the law applicable to discharge without cause. See, e.g., 3A A. Corbin, Contracts § 683, at 223 (1960).

As might be expected, there are cases dealing with this kind of situation. The more sensitive rules deal with "discharges" related to union activities, see, e.g., *Muller* v. *United States Steel Corp.*, 509 F.2d 923 (10th Cir. 1975); *J. P. Stevens & Co.* v. *NLRB*, 461 F.2d 490 (4th Cir. 1972), or to sensitive areas such as age, sex, race, or religion. See, e.g., *Clark* v. *Marsh*, 665 F.2d 1168 (D.C. Cir. 1981); *Bourque* v. *Powell Electrical Manufacturing Co.*, 617 F.2d 61 (5th Cir. 1980); *Young* v. *Southwestern Savings & Loan Association*, 509 F.2d 140 (5th Cir. 1975). Since this allegation has not previously been before us, no standards have been set out with respect to constructive discharge claims. It behooves us, then, to first examine this case carefully to see if its facts justify exploration, for Vermont, of this area of the law.

Mr. Bushey was employed by the Department of Corrections from June, 1975, until his controverted resignation in January of 1981. By August of 1979, Bushey occupied the number two slot at the Woodstock Community Correctional Center [hereinafter Woodstock]: Assistant Superintendent "A", pay grade 15. It appears that significant problems had been developing at the Woodstock facility, evidenced not least by the high employee turnover rate. This rate was found by VLRB to be 122% in 1979 and 96% in 1980, "much higher than existed at any other correctional facility." Various other indicia of discontent were apparent at the facility, and were in fact chronicled in a grievance signed by twenty-four employees (excluding appellee) and presented to the superin-

tendent of Woodstock. After an unsympathetic reception, some of the employees pursued their grievance with the Commissioner of Corrections during a meeting in Waterbury. The Vermont State Employees' Association [VSEA], representing the dissatisfied workers, filed and later withdrew an unfair labor practice complaint as a result of events occurring at the Waterbury meeting. Ultimately, a protest "sick-out" was staged by eight or nine Woodstock employees. Subsequently, two of the protesters were fired.

As a consequence of these and other disruptions, the Department of Corrections began to observe more closely and finally to participate actively in the day-to-day operations of Woodstock. Richard Bashaw, Director of Adult Facilities and number three man in the Department of Corrections, was sent with an assessment team to identify and make recommendations for correcting the problems at the facility. Bashaw eventually implemented new work schedules over the superintendent's objection. He then took full control of Woodstock by demanding and receiving the superintendent's resignation on Sunday, December 14, 1980.

One of Bashaw's first acts was to change grievant's work schedule so that he was working part of the time on the night shift as shift supervisor, and the rest of the time on his regular shift as assistant superintendent. Bashaw justified this as necessary in order to provide an experienced supervisor for each shift. Although Bashaw's motives may appear suspect in view of the callous way he implemented the change, it was true that two of the three supervisors at Woodstock had been dismissed in connection with the November sick-out and other employees had resigned. The facility was being run in part by personnel borrowed from other locations within the correctional system. It was alleged that shift supervisors were needed who were familiar with the physical peculiarities of the Woodstock building. Grievant, however, viewed the change as a de facto demotion in that it required the performance of pay scale 10 duties and, of necessity, prevented the performance of "normal" assistant superintendent duties. The grievant knew that a schedule change under nonemergency circumstances was grievable under Article XVII of the collective bargaining agreement, yet he never filed a grievance.

Bashaw also ordered grievant Bushey to move out of his office and into another one in a distant corner of the facility. Bashaw told Bushey that his office was needed so that Bashaw's secretary could be close at hand. Bashaw then sped up the process by having all of Bushey's belongings "carefully" packed in boxes and moved to the empty office the next morning before Bushey arrived. It is unclear to us why Bashaw felt the need to employ such discourteous tactics. Nonetheless, we need not decide the accuracy of the Department of Corrections' characterization of Bashaw as "not a master of tact . . . in fact, a blunt man trained to make hard, fast decisions in the context of running a secure corrections facility."

In sum, Bushey's main complaints, changes in his shift, duties and office location, appear to be grievable issues under the employment agreement which he did not attempt to resolve through established channels. VSEA, as the union representing appellee, is guided by a lengthy and detailed agreement, offered in this case as a joint exhibit. The grievance procedure, Article XVI, is designed "to provide for a mutually satisfactory method for settlement of complaints and grievances [with the expectation that] employees and supervisors will make a sincere effort to reconcile their differences as quickly as possible at the lowest possible organizational level."

These admirable purposes are achieved with a four step procedure: At Step I, the employee and/or his union representative meets informally with the immediate supervisor to discuss the problem. Bushey did meet with acting Superintendent Bashaw and the initiation of a formal grievance was discussed at that time. Step II, however, was never taken. At that stage, a formal written grievance is filed at the departmental level. Meetings may or may not be held, with the goal of early resolution clearly paramount. At Step III, the formal grievance is taken to the Department of Personnel, which after review and meetings, hands down a written decision. Finally, at Step IV, an appeal may be taken to the VLRB.

As we have said, Bushey only went as far as Step I. The agreement does provide, however, that "[a]n employee may appeal his/her dismissal directly to the Vermont Labor Relations Board." Thus we return to Bushey's original chain of

inferences: (1) He resigned involuntarily and under pressure which is tantamount to a dismissal. (2) Under the employment agreement, dismissals are grievable directly to the VLRB. (3) In that no just cause existed or was even alleged for his dismissal, the discharge was unlawful. (4) He was therefore correctly awarded back pay and reinstated by the VLRB.

The linchpin of this analysis is step one. Appellee on January 8, 1981, handed to the newly appointed superintendent a resignation letter addressed to Bashaw which read in toto:

> I am hereby resigning my position as Assistant Superintendent of Woodstock Community Correctional Center effective January 22, 1981.
>
> Over the past six weeks the working conditions at this facility have become intolerable and an effront [sic] to basic human dignity.
>
> Sincerely,
> /s/ Royal Bushey
> Assistant Superintendent

The VLRB found the circumstances surrounding the typing and submission of his letter highly probative of the coercive environment grievant claimed to be in. Both sides, however, alert us to the fact that testimony before the VLRB was contrary to the findings made by the Board. It is uncontroverted that grievant went to the former superintendent's home before work on January 8, 1981. The VLRB found that Bushey discussed the possibility of tendering his resignation and was told by his ex-boss that he was "next on the list" to be fired. They also found that when Mr. Bushey arrived at work, he went to the new superintendent's office.

We find it significant that Bushey wrote his letter of resignation before he went to the superintendent's office, contrary to the finding of the Board. While waiting for his letter to be typed by a worker in the adjoining office, Mr. Bushey overheard a telephone conversation which he correctly assumed concerned his status at Woodstock. However, he incorrectly assumed that he was about to be fired. When his letter was typed, he brought it into the superintendent's office, presented it and announced, "Here, I beat you to the punch." The

Board's evaluation of grievant's resignation is colored by its erroneous conclusion that the resignation was prepared immediately after the overheard conversation. While mindful that we must sustain on appeal the Board's findings if any credible evidence fairly and reasonably supports them, *In re Young*, 134 Vt. 569, 367 A.2d 665 (1976), this finding and the conclusions which flow from it are unsupportable.

In *Lane* v. *Department of Employment Security*, 134 Vt. 9, 347 A.2d 454 (1975), the employee resigned after a meeting with his superior but later filed for unemployment compensation. Particularly relevant to the instant case are the circumstances surrounding the resignation. Lane had prepared and carried around his resignation for some time, eventually producing it at what apparently struck him as an opportune moment. We there held that his argument of a forced resignation was unavailing given the premeditation shown by the facts. Although here the resignation was prepared by Mr. Bushey the same day it was submitted, not three months prior as in *Lane*, it clearly was not tendered as a result of a highly emotional and destabilizing conversation as he would have us believe.

Bushey's own testimony was that he was pleased with the appointment of the new superintendent, feeling him to be a man he could work with. He also testified that he had come to distrust the integrity of the senior Department of Corrections staff and felt that a resignation would look much better on his record than a discharge. Bushey clearly was insecure in his position and, from all appearances, this belief had some foundation in fact. The fateful telephone conversation concerned placing Mr. Bushey on a "special probationary status" during which time his work performance was to be carefully monitored. We note that the grievant had discussed his resignation with others, had evaluated his job under his new superior and had made what appears to have been a reasonable personal choice under the circumstances. The evidence does not support his claim that the telephone conversation put him in "emotional turmoil" or provided the push that forced him to resign.

We return now to the facts surrounding Mr. Bushey's resignation to see if they mesh with the constructive discharge doctrine we have here outlined. We begin by noting that it is

abundantly clear that Woodstock was not operating under normal conditions during the period that Royal Bushey was found to have been constructively discharged. It is true, as found by the VLRB, that no formal emergency had been declared which, pursuant to the employment agreement, would have suspended many of the procedural safeguards granted under the employment agreement. Nonetheless, the actions of acting superintendent Bashaw were not then and are not now being challenged as violative of the procedural clauses in the employment agreement. No grievance procedures were carried forward in connection with them.

We observe also that Mr. Bushey was told that his new duties were temporary. Yet both he and the VLRB place most stress on two work occurrences, the schedule change and the office move. The schedule change was specifically designed to provide experienced coverage for Woodstock for the period between the firings of two shift supervisors and their replacement. When Mr. Bushey complained of the shift change, which at first would have put him completely on a shift supervisor schedule, a compromise solution was reached which would allow him to perform his key managerial duties three days a week. The necessity of the office move we view as problematic. The transcript of the VLRB hearings reveals that Bashaw was under the impression that Bushey was to vacate immediately his office. Bushey thought he had some indefinite amount of time for the move. This misunderstanding was unfortunate, but it serves only to reaffirm our belief that in-house resolution of problems should first be attempted. We emphasize that for neither action did he file a grievance.

Royal Bushey seeks to have us consider rumors from employees of the Department of Corrections assigned to other facilities as evidence of the malo animo of the Department. He urges that we give weight to allegations of contrived firing of other employees and that we infer that a department so inclined would not hesitate to act similarly in this case. However, we find his actions inconsistent with his present argument. While we do not discount the pressure appellee may have felt, the very fact that he worked the new shift and even expressed optimism at the management change refutes the contention of intolerable working conditions, and runs counter to the charge of deliberate purpose to provoke a quit.

While Mr. Bushey may have had a grievance as a result of Bashaw's actions, he did not resign involuntarily. His claim to that effect is most strongly belied by two considerations. First, he testified that even had he known that his notion that he was about to be discharged was mistaken, as it was, he still would have resigned. Secondly, his present position is undercut by his failure even to attempt to retract his resignation upon discovery of his mistaken view of the facts. By his failure to try to withdraw his resignation under the facts before us, the grievant elected not to test the claim that the Department was intentionally forcing his resignation. Instead his case must now rest on the strength of inferences sought to be drawn from the managerial actions already discussed. For the reasons already noted, those actions do not sustain his contention. A difficult employment environment can generate a voluntary resignation. Involuntariness, in this sense, must be the product of purposeful actions directed at obtaining the resignation. Moreover, the cases which have found involuntary discharge to have occurred consistently reveal sustained discriminatory acts by management, see, e.g., *Clark* v. *Marsh, supra,* 665 F.2d at 1174 (countless informal and two formal administrative complaints, all futile, over the course of four years), or at the least, a serious infringement of a fundamental right, see, e.g., *Young* v. *Southwestern Savings & Loan Association, supra* (mandatory attendance at company prayer meeting), neither of which is present here.

With the contention that the resignation was other than voluntary not supported by the record, the basis of the Labor Board action is also unsupported.

*No grievance having been established, the action of the Vermont Labor Relations Board is reversed and the cause dismissed.*